BILL JACK THURMAN *v.* STATE OF ARKANSAS

5546                                    461 S. W. 2d 113

Opinion delivered December 21, 1970
[Rehearing denied January 18, 1971.]

*Murphy, Carlisle & Taylor,* for appellant.

*Joe Purcell,* Attorney General; *Milton Lueken,* Asst. Atty. Gen., for appellee.

CONLEY BYRD, Justice. Appellant Bill Jack Thurman was charged with first degree murder in the killing of Vonne Carolyn Farmer on November 30, 1969. The jury found him guilty of voluntary manslaughter and fixed his punishment at 7 years in the state penitentiary. The only question raised on this appeal is whether the conviction of voluntary manslaughter was substantiated by the evidence.

The record shows that appellant Bill Jack Thurman, age 27, and the deceased Vonne Carolyn Farmer, age 29, lived together from June until her death on November 30, 1969. At the time of her death the parties were living in a house near the airport on Highway 71 south of Fayetteville. It is undisputed that Thurman and Mrs. Farmer were at the Corral Lounge around 8:00 or before that evening. Mrs. Farmer left the Corral Lounge, later went to the Rockwood Club and again showed up at the Corral Lounge at approximately 12:00 midnight. Thurman remained at the Corral Lounge until he left with the deceased. According to officers Gene Phillips and Joe Black of the Fayetteville Police Department, the parties arrived home shortly after

12:00. The policemen followed them home because of the excessive speed at which Thurman drove his car. However, they made no arrest but immediately turned around and drove back to the Corral Lounge area and at that time were notified of the shooting. Officer Joe Black stated that the parties were not sitting close together on their way home.

It is undisputed that decedent's body was found near the refrigerator and that her death was caused by a shot from a 1894 model 30-30 Winchester.

Appellant's defense was that after they got home they visited for a minute or two, then decedent stated that she was going to get her two children whom she had left with her niece. He then told decedent that he was going to clean his rifle which he took from a bedroom closet. About that time the deceased stooped over to pick up something and the rifle accidentally discharged. Appellant admits that decedent had keys to her car in her hand at the time the rifle discharged. However he disputes her possession of his payroll check stub. The defendant in his own behalf testified that he arrived home from deer hunting between 6:00 and 6:30 P.M. and that when he came in he didn't unload the gun but put it up loaded. According to him, however, the gun was not cocked when he put it up.

The evidence on behalf of the State from Dr. John William Vinzant and Dr. Mae Nettleship was that the bullet entered some 2 or 3 inches below the chin, went straight through and came out of the back slightly above the kidneys—that is, the angle of the wound would be 30 to 45 degrees downward. There were powder burns on her right thumb and chin.

Officer Joe Black testified that when he returned to the house after the shooting the weapon was lying next to the decedent's body. At that time it smelled of gunpowder and he determined that it had been recently fired. The rifle had five live rounds in it, one in the chamber and four in the magazine. He found the expended round in the house. He also observed car keys and a check

stub in her hand. Her purse was on the floor just north of her. Having determined that the house was located outside the city limits of Fayetteville, the officers called in the sheriff's deputies.

Decedent's brother, Virgil L. Poor and his wife, with others, were at the Rockwood Club on the night in question. According to Poor decedent came to the Rockwood Club and sat with them for approximately an hour. At her request he went to the Corral Lounge and asked the appellant to go back with him to the Rockwood Club. His testimony is that appellant inquired who decedent was with and when Poor told him that she was with him, appellant merely said, "All right."

Loretta Elizabeth Graham, a/k/a Betsy Graham was employed as a carhop at the Chuck Wagon Drive-In. This is located on property adjoining the Carrol Lounge, with food being served from the drive-in into the lounge. She says that after the decedent left the Corral Lounge, appellant stopped her and wanted a cheeseburger and told her to tell the decedent to pay for it. At this point she lied and told appellant she did not know where decedent was although decedent was apparently on the Chuck Wagon premises. When she delivered the cheeseburger she told appellant she did not know where decedent was and that he would have to pay for it. At this time appellant made inquiries to find out if she really knew where decedent was and as she started out the door, decedent made the statement, "I think if I find that. . . woman, I'll kill her."

Captain Paul R. McDonald with the Arkansas State Police examined the 1894 model 30-30 lever action rifle and determined that the bullet found in the house was fired from the rifle. He also performed tests upon the rifle in both a half cocked position and a full cocked position. According to him the jarring test he performed exceed the jarring involved in dropping a rifle. In these tests he found no malfunction in the rifle that would cause it to accidentally discharge. The trigger tests showed that it would take five and a half pounds

pulling pressure to cause the rifle to fire from a full cocked position.

Glen E. Logan, criminal investigator for the Washington County Sheriff's Office, testified that the first thing he noticed when he entered the house was a slight disarray in the front room with the furniture and blood spots on the floor between the living room and the kitchen area. Concerning the disarray there was a sectional couch that was moved around and a rug was thrown up across one.end of it. The body had already been removed by the time he had reached the scene. According to his investigation the bullet from the rifle after passing through the decedent's body ricocheted off the refrigerator into the floor, from the floor to the stove handle, then the bullet hit the open oven door and ricocheted back completely through the house into the northeast corner of the living room. The spot on the refrigerator was exactly eight inches above the floor. From the refrigerator to where it hit on the floor was nineteen inches. The measurement from the spot on the floor to the oven door was thirty inches and then the path of the bullet from the stove to where it was located was twenty one feet and seven inches. On rebuttal the officer stated that they made a complete search of the premises looking for cleaning equipment for the gun and that they found no oil, cleaning rags or cleaning rods whatsoever.

When the proof relative to the disarrayed condition of the house and the powder burns on the chin and the thumb are considered together in connection with the threat made to the waitress, Betsy Graham, it appears to us that it would support a conviction of a higher degree of homicide than voluntary homicide. Under these circumstances our cases point out that one cannot complain that the proof is insufficient to sustain the lesser degree of homicide when it would have sustained a conviction of a higher degree. See *Patrick* v. *State,* 245 Ark. 923, 436 S. W. 2d 275 (1969).

Affirmed.